Peele, J.,
delivered the opinion of the court:
The questions presented for our decision arise on the claimants’ motion for a new trial, the material and substantial grounds of which are that the court erred in finding that the claimants had voluntarily signed the waiver which was interposed as a successful defense, and in holding said waiver binding upon them “in derogation of the right granted by *235 statute to extra pay for hours employed in excess of eight per day.”
Judgment was rendered in the case, dismissing the petition, May 23,1898. (33 C. Cls. R., 417.)
The claimants, letter carriers in San Francisco, brought suit for services claimed to have been rendered by them in excess of eight hours a day, under the act of May 24,1888 (1 Sup. Rev. Stats., 587), which reads:
“Be it enacted, dec., That hereafter eight hours shall constitute a day’s work for letter carriei’s in cities or postal districts connected therewith, for which they shall receive the same pay as is now paid as for a day’s work of a greater number of hours. If any letter carrier is employed a greater number of hours per day than eight he shall be paid extra for the same in proportion to the salary now fixed by law.”
The commissioner to whom the case was referred for investigation reported that certain overtime had been made by the claimants, and, in the absence of any proof offered to “vary the conclusions of the commissioner as to the amount of overtime made by any particular claimant or class of claimants,” it was agreed by the Assistant Attorney-General that the commissioner’s “findings on that subject shall be accepted as prima faoie correct.” We have no reason to doubt the correctness of the commissioner’s report in respect of the overtime so reported by him.
The substantial facts disclosed by the findings are that soon after the passage of the act referred to, and while the claimants were engaged in the performance of their duties under a schedule theretofore adopted by the postmaster at San Francisco, the Postmaster-General issued, or caused to be issued, May 29, 1888, a circular letter whereby postmasters were required to “reorganize the free-delivery service at all offices,” so as to comply with the provisions of the law referred to; and for that purpose they were directed, in case carriers were performing more than eight hours of actual labor per day, to so reorganize their respective force as not to exceed eight hours.
In conformity with the instructions of the Postmaster-General so given, the postmaster at San Francisco arranged a schedule, to go into effect September 5, 1888, whereby the *236 service to be performed was not to exceed eight hours per day. The carriers were not satisfied with the new schedule for several reasons, set forth in Finding III, and they so informed the assistant postmaster, and at the same time requested that the old schedule be continued in force. They were informed that by reason of the instructions of the Postmaster-General that could not be done unless thejr would waive any claim that might accrue to them for services rendered thereunder in excess of eight hours per day.
To this they consented, and to effect the arrangement a meeting of the carriers was called, at, which the following resolution was passed:
“SaN FraNCIsco, Cal., Sept, k, 1888.
“ Whereas we, the letter carriers of the San Francisco post-office, realizing the difficulties in the way of making a schedule time for deliveries and collections under the new eight (8) hour law, and being aware of the fact that our work under the present schedule does not exceed eight (8) hours, and feeling that the new schedule (recently issued, to go into effect Sept. 5, 1888) will work a hardship on us and will not give as satisfactory a service to the public as the present schedule: Therefore be it
“Resol/oed, That we do respectfully request Dr. Wm. J. Bryan, postmaster of San Francisco, Cal., to allow the present schedule to remain in force, we hereby waiving all claim to. any pay for overtime that might appear to be due.”
The language of the preamble and resolution was suggested by the assistant postmaster and reduced to writing by one of the carriers.
With the exception of a few carriers who were absent from the meeting or sick, all of them signed the resolution thus passed, and being thus signed the old schedule was continued in force, so that whatever overtime was made by the claimants after September 1, 1888, was made under said old schedule after they had signed said resolution.
The theory upon which the case was dismissed was that the claimants’ right to extra pay under the act depended on a contract of employment by the postmaster, who was the agent of the Government to direct such service, and that therefore such extra pay formed no part of their official salary and *237 could be waived, even though such right was conferred by law. (Bishop on Contracts [ed. of 1887, section 792].)
Thus viewing the case, the court held that-—
'‘As the law conferred upon the carriers a personal benefit only in the event of their employment, they could waive the same without injury to others or without affecting the public interest, and having voluntarily signed the agreement waiving all claim to extra pay for such overtime they are estopped from asserting any claim thereto, and their several petitions are therefore dismissed.”
The claimants contend that their signatures to the resolution aforesaid were not voluntary; that they, or some of them, were threatened with loss of place or suspension if they refused to sign, and therefore their signatures were obtained by official duress.
In respect of the signatures of the claimants to the resolution it is recited in Finding III that, “with the exception of a few who were absent or sick, all the carriers, and particularly all of the claimants herein, voluntarily and for their mutual interest and advantage signed the resolution after the «ame had been read by, or made known to, them.”
The question as to whether the resolution was voluntarily signed by the claimants or whether signed under official duress necessitates an examination of the evidence before the court at the time of the trial of the case and such newly discovered evidence offered by the claimants as may be material to the question involved.
We have carefully examined the testimony of the witnesses detailing the circumstances under which the resolution or waiver was signed, the substance of which is that they signed, some through fear of losing their places, others through fear of suspension, while others signed on the advice of their immediate superior officers at the several stations.
And while there is some testimony to the contrary, and some to the effect that no coercion was used, still the circumstances of the case tend to show that while there was not such duress as would in law be recognized between individuals on equal terms, yet the relation of the carrier to the postmaster was such that their signatures to the resolution may perhaps be *238 regarded as haying been obtained under such circumstances as. tend to rebut the theory of a voluntaiy act.
In this respect, therefore, the findings do not fully disclose all the facts. But while that is true the circumstances under which the claimants signed the waiver can not be said to constitute such duress as would relieve them had the transaction been an ordinary one of contract between individuals, Was it as between them and the postmaster ?
In the case of Robertson v. Frank Brothers Co. (132 U. S. R., 17, 23), being an action to recover customs duties alleged to have been paid to avoid an onerous penalty, the court, speaking by Mr. Justice Bradley, said: “When such duress is exerted under circumstances sufficient to influence the apprehensions and conduct of a prudent business man, payment of money wrongfully induced thereby ought not be regarded as voluntary. But the circumstances of the case are always to be taken into consideration. When the duress has been exerted by one clothed with official authority, or exercising a public employment, less, evidence of compulsion or pressure is required, as where an officer exacts illegal fees or a common carrier excessive charges. But the principle is applicable in all cases according to the nature and exigency of each.”
On page 21 it is said: “In our judgment the payment of money to an official, as in the present case, to avoid an onerous penalty, though the imposition of that penalty might have been illegal, was sufficient to make the payment an involuntary one.”
In the case of Swift Co. v. United States (111 U. S. R., 28) the claimant, as manufacturer of friction matches, had furnished its own dies, and for that reason was entitled to a commission of 10 per cent, payable in money, on purchases of stamps for his own use of over $500 at any one time, but for some time accepted payment in stamps, because, under a rule of the Commissioner of Internal Revenue, payment would not be made in any other way, the court said:
‘ ‘ The question is whether the receipts, agreements, accounts, and settlements made in pursuance of that demand and necessity were voluntary in such sense as to preclude the appellant from subsequently insisting on its statutory right.
“We can not hesitate to answer that question in the nega *239 tive. The parties were not on equal terms. Tbe appellant had no choice. The onty alternative was to submit to an illegal exaction or discontinue its business. It was in the power of the officers of the law, and could only do as they required. Money paid or other value parted with under such pressure has never been regarded as a voluntary act within the meaning-of the maxim, Volenti non fit imjuriaV •
The question is, Does the present case come within the rule announced in those cases ? The postmaster was clothed with official, authority. The claimants as letter carriers were subject to Ms official direction and control, and for any disobedience of his orders they could have been suspended or even dismissed, as ruled in the case of the United States v. Post (148 U. S. R., 124, 133). Under the rule stated less evidence is required to establish compulsion or pressure when exerted by one clothed with official authority than would be required between private persons.
In the present case it could not be said that there was compulsion in the sense in which that word is ordinarily used, nor can it be said that the pressure was such as to influence the action of an ordinarily prudent man in the transaction of business between individuals on equal terms.
The request to continue in force the old schedule came from the carriers, as set forth in the findings, because the new schedule “extended their services over a greater number of hours’and because they could not utilize the intervals between deliveries at their respective homes or to their advantage and satisfaction otherwise so well as they could under the old schedule.” By reason of the instructions of the Postmaster-General they were informed that the old schedule could not be continued in force any longer unless they would waive all claim thereafter accruing for services rendered in excess of eight hours per day.
Undoubtedly the carriers, from self-interest, preferred not to waive their right to claim for such overtime, but when that was required of them.the alternative was presented as to whether they would accept the new schedule or sign such waiver and continue under the old schedule. They chose the latter, and as the new schedule was designed in conformity with the instructions of the Postmaster-General to conform *240 to the eight-hour lawv we reach the conclusion that the signatures of the claimants were not procured by such official pressure or duress as to bring' the case within the rule stated.
The more difficult question in the case is, Had the postmaster any right to require of the carriers a waiver of the compensation fixed by statute for services to be thereafter rendered?
While we have held that to entitle a carrier to extra pay for service in excess of eight hours per day he must show that he was employed during that time in active postal duties and that such employment was a matter of contract, still his compensation therefor is fixed by statute and not by contract, and that being so, even if his employment be a matter of contract, can such compensation be waived for services thereafter rendered under the circumstances of this case?
When a earlier is employed, engaged in active postal duties, in excess of eight hours per day, his pay therefor is as-' defi-nitety fixed by law as his regular salary. That is to say, the extra pay provided for such active duties by the act of 1888 (supra) is “in proportion to the salary” he receives; and that being so, had the postmaster any authority to either increase or diminish the same or to take it away altogether, even though the carriers consented to perform such services without compensation?
The extra pay, like the salary, is fixed in the statute-as the measure of compensation for the services to bo rendered and is designed to secure efficiency in the public service. That being so, to diminish or take away'such extra pay would be against public policy.
Such was the view of the court in the case of Hawkeye Insurance Company v. Brainard (72 Iowa, 130, 132), wherein it is said:
“ If by contract he may take less, why may not the parties contract for an enlarged compensation? We think a contract whereby an officer agrees to accept a less or greater compensation than is prescribed by statute, or whereby he agrees not to avail himself of a statutory mode of enforcing the collection of his fees, is contrary to public policy and void, and that the contract in question is'of that character, and therefore the demurrer was correctly sustained.” (Gilman v. Des Moines Ry. Co., 40 Iowa, 200; McConkey v. Chapman, 58 Id., 281.)
*241 Although the officer in that case was a justice of the peace, who had agreed in respect of suits commenced by the appellant therein that no costs or charges should be collected by him therefrom until the same had been collected from the opposite party, and in case no such collection was made that then said officer was to lose his costs, still the principle as to the right of diminishing such official compensation by contract is the same as in the case at bar.
The overtime service was performed by the claimants as letter carriers, the same as their regular service was performed, so that the compensation for such overtime was in the nature of, if not, official compensation, and the court is therefore unable after a more careful consideration of the case to draw any distinction which would deny the applicability of the authorities to the extra pay of carriers even though their employment to perform such service be a matter of contract.
In the Adams Case (20 C. Cls. E., 115, 117) and the numerous authorities there cited the. principle is announced that “the appointing power has no control, beyond the limits of the statute, over compensation, either to increase or diminish it;” and such we understand to be the well-settled rule. The reason for the rule is that such claims “rest not upon any contract with the Government, either express or implied, but upon acts of Congress. ” (United States v. McLean, 95 U. S. R., 750.)
While the decisions cited, and many others of like purport, refer to the salary or regular compensation of officers fixed by law, the reason for the rule is equally applicable to extra compensation also fixed by law for services rendered within the line of official duty, and in the interest of the public service should stand upon the same basis.
Therefore, on a reconsideration of this case, after elaborate and able arguments on both sides, the court is constrained to reach a different conclusion from that reached on the trial of the case, and hence the claimants’ motion for a new trial should be allowed, which is accordingly ordered.
Howry, J., dissented.